The next case for argument is 24-1080 Karingten v. DVA. Are we ready, Mr. Schopenbrock? Yes. Please proceed. Thank you. May it please the Court, Alan Schopenbrock on behalf of the Petitioner at Council's Tables, co-counsel Amanda Smith. Petitioner is a military veteran who suffers from PTSD attributed to military sexual trauma. At the time of the underlying events on appeal, she has a 70% service-connected disability rating. She worked at the VA for several years, and in 2017 she was in a difficult position with her supervisor. Can I just ask you about your removal? You want her to be reinstated, a reversal of the removal? Yes. Do you ask for reinstatement to somewhere else, or does reinstatement suggest that it's the position that she vacated? So that's what you're seeking? I don't believe that it really matters. I think it's a reversal of the underlying order. From there, it's really up to whether the position is available to her, whether it's the same position or a different position at a different facility. But ultimately we are asking for reinstatement of the position that she was removed from. So she was removed in August 2017. She was a GS-9 training specialist, 14 years of civilian service, and it was all based on one incident that happened in May, a couple months prior. In May, on May 10th specifically, she was suffering from PTSD, an induced anxiety attack, based on events that were leading up that happened with her supervisor. Recognizing that she was going through a crisis, she removed herself from the work environment and placed herself in a private room to call the Veteran Crisis Line, believing it was a confidential conversation, at which point she disclosed to that telehealth operator that she was having thoughts of harming her supervisor, at which point the VCL telehealth operator dispatched the VA police, and during the same conversation the VA police overheard the statements that she made to the telehealth operator. From there, the petitioner was escorted out of the room, taken to a psych evaluation, at which point the VA police relayed the statements that they overheard from the petitioner to the intended recipient or the intended victim. Was she aware that the VA police overheard these statements or were listening? I think based on the investigator's report, it could be implied based on the investigator saying that she hung up the phone because she didn't want to have two conversations at the same time, but she wasn't speaking with the VA police during the conversation. They walked into the room, overheard the conversation. And she was aware that they were in the room while she was having the conversation? It appears that way because based on the— She says, I can't have two conversations at once, so she hangs up on whoever the hotline person was and repeats it to the police, right? Respectfully, that's not what she said. That's what's in the investigator's report. That was what was relayed by the VA investigator that walked into the room. So it's based on hearsay, which is acceptable. But she didn't actually say that. That was based on the investigator's statement. Did she dispute that? Well, the case didn't go to hearing. It was done on the briefs. And I don't think the facts are in dispute at all, really. I think what's really in dispute is whether she caused the disruption that came from the comments that were overheard. And this is based on the assertion that when she said she wanted to kill her boss, identifying him by name, no one should have told her boss that she made that statement? Whether or not there was a duty to inform the boss, again, I don't think is necessarily relevant. I do believe that if— When you call it a disruption, I'm sorry to interrupt, but when you say disruption, is it the disruption with the police officers or is it the disruption because her boss found out? I think the agency's position is the disruption was based on the individuals that learned of the statement and their anxiety and fear that followed. Okay, so back to Judge Andrew's question about they shouldn't have responsibly— I don't know whether they had a duty or not, but didn't the responsible thing to do would be to tell the supervisor that someone had threatened his life? Well, they did tell the supervisor, and I think it's more based on the reaction of the supervisor and the reaction of another individual who, for unknown reasons, was also told by the VA police, which the statement was not— Do you think there was something abnormal or unnatural or unexpected in the reaction that the supervisor had? I think it is completely natural for someone to react with anxiety and fear, thinking that someone wants to harm them. At the same time, the supervisor indicated that he was going to be on leave the next day. He was on leave for a week, and only after that leave is when he contacted local police to figure out what he can do. So where does that get you? Well, I think in addition to all of that, there's a lot of context here because for almost a year and a half, two individuals, the petitioner here and the supervisor, had a pretty acrimonious relationship. Well, you say in your brief she has been unfairly harassed and discriminated against for over a year and a half. We have no record to establish that, right? You set that up as background facts, but don't you think that would be disputed? So it was never decided. There was no judgment that, in fact, she was harassed. However, the appendix does support that she filed EEO complaints. She filed a EEO complaint naming this particular supervisor, I believe a year before the event, where there were several claims naming him, including wanting to be reassigned from him and asking to be accommodated, of which he refused. So the history between the two of them I think is relevant because at the day of, she felt like he was harassing her, that he was unfairly criticizing her work performance. And that email exchange is in record, correct? Yes. So I don't know where it is exactly, but do you want to point me to anything in particular in that exchange that you would find to be harassment or discrimination? Well, again, Your Honor, there was no decision made of whether or not she was actually harassed under the law or actually discriminated under the law, but she felt that way. She went through the EEO process. She initiated that process, went through a mediation, and then it resolved. And so I appreciate what you're saying, but where does that get us at the end? I mean, you're not excusing, you're not trying to excuse the statements made should not have been made, right? Absolutely. I'm not trying to excuse the statements that she admittedly made. She admittedly made that statement. I think it's more about the context of that statement when it was made. She understood she was going through a crisis. She's a veteran. She's an MST victim. She took herself out of the environment to avoid a disruption. She did not intend to, and I understand intent is not part of the elements here, but it is part of the penalty analysis of which they still removed her. But all that said, her intent was to not cause disruption. It was to take herself away from that environment. And unfortunately, you know, she was removed over it. And I think the agency and the board below, they cite to the Gray case, and I think they made it very comparable to the facts here and so far that there's an individual in that case that was having issues with their supervisor that same day. There's a disagreement about a hand truck. That employee then decided that he was going to go to the medical unit, made statements to two nurses that were pretty egregious, that they also wanted to harm their supervisor. But it was worse than that. It was pretty bad. So the nurses called over a safety plan coordinator and an OSHA representative, and those statements were then repeated to those individuals in a completely separate location. So among other charges, it included disruptive conduct here. And so ultimately the board found that case to be comparable because of the repeated nature of the statement. And here Petitioner essentially was removed for repeating her statements in the presence of the VA police. The reason why those are distinguishable is because the individuals here that felt the anxiety and the fear were her supervisor and, again, some other individual that we don't know why they were told of the statement. Was it the other individual, the head of HR? No, it was not head of HR. It was an administrative officer. I believe it was someone in her supervisory chain, but also based on her declaration talked about the EEO complaints that she had against the actual supervisor that she said she wanted to harm. And also talked about the context of the work environment, that there were issues between her and the supervisor. But I don't believe it was a human resources individual. But what do you think should have been done here? I mean, nothing? I mean, this was caused because the police told the supervisor. In other words, they shouldn't have told the supervisor, so they were responsible for the disruption, not her comments? I think what should have happened here is that the Petitioner was supposed to get the care that she was entitled to. She did go to the psych unit. She was cleared. With regard to the police informing the supervisor and other individuals, if they felt a duty that was necessary, that's their duty. But what should not have happened here is that the Petitioner should have been removed for doing the right thing and taking herself out of the situation, calling a confidential line. I mean, I don't think anybody disputes that under the circumstances here, she did the right thing. The question is, we're still left with her threats to kill the supervisor, even if she, at the moment, absolutely did the right thing. I mean, she didn't act on her panic attack. She has a history that supports some things that have happened, but that doesn't wipe away the fact that she threatened her supervisor's life. Again, I think the particular language that was used was not that she was going to. It was that she felt that way. She felt she wanted to do that, not that she was going to act on that. In fact, the VA investigation found there was no credible threat, and I understand she was not charged with a threat, and the met standards don't apply here. But, again, that is, I think, relevant, that there was no credible threat. She was never arrested. She was not criminally charged. The VA itself found it was incredible. What should have happened is, you know, again, they investigated internally. She was taken to a medical unit. She was cleared. She should not have been fired over this. But she actually wants reinstatement in the same job, or she's having these sorts of thoughts and desires to kill her supervisor? She doesn't want a different job? Well, procedurally, she prevailed on appeal. The administrative judge actually reversed the charge. Part of the interim relief was that she was reinstated. When the agency filed their petition for review, they affirmed and certified that they complied with that interim relief, and she was brought back to that job. That's where the record ends here, and I'd rather not go beyond that unless you want me to answer what happened beyond that. But she was reinstated, and five years later the board reversed because there was no quorum. So to answer your question, Your Honor, she does want to go back to federal service. What the agency does with that, whether they place her in the same position, whether those individuals are still there or not, I don't know. Okay, why don't we hear from the other side? Thank you for your time. May I please have the court? Substantial evidence supports the board's conclusion that the VA approved the charge of disruptive conduct. What import should we take from the fact that she was reinstated after the AJ opinion? None, because they did it pursuant to the order of the AJ, not voluntarily. Did she work remotely during that period? Did he work remotely during that period? That I don't know. That's not in the record. Is it not indicative that nothing happened during that five-year period, or that's absolutely off limits for us to consider? I think that's beyond the scope of the record, and I think it's off limits for the court to consider. One of the things that was significant about the removal was that there was no evidence. When the Douglas factor analysis was done, there was no evidence that this mental impairment had been remedied. That was a major concern. The seriousness in this conduct, the major concern was that there's no evidence. You're saying that. He said that she was clear that she was not a threat to others or to herself, but you're saying that isn't. In addition, the record reflects that this was not out of a clear blue sky. As the deciding official noted, the discussions are at page appendix 81, she'd actually within the year received an admonishment for not one, not two, but three incidents of inappropriate conduct towards a coworker and a customer. So this didn't come out of a clear blue sky. There was a pattern of problem behavior. The deciding official also noted that staff members, this is at page 89, inform me they do not feel safe interacting with her and feel that she has the potential to harm someone in the workplace. For these reasons, they requested not to have to work with her directly. Several external customers have also requested not to work directly with Ms. Croft, now Ms. Carrington, due to her behaviors. The VA has a policy of prevention of violence in the workplace. Defining disruptive behavior is behavior by an individual that is intimidating, threatening, dangerous, and that has or could jeopardize the health and safety of the patients, employees, and other individuals at the facility. That's at appendix 150. So it did serve the needs and the efficiency of the service to remove her under these circumstances. As unfortunate as they are, I don't think that anyone is up here not being sympathetic to a veteran who is experiencing PTSD, and this event was unfortunate. But there are others in the federal service other than Ms. Carrington, and they are the individuals that the government has a duty to protect under the VA's policy to prevent violence in the workplace. That policy makes clear that behavior likely to induce anxiety or fear is absolutely unacceptable in a VA facility, and that was the unfortunate consequence of this. But I want to circle back to the notion that... Sorry, before you do, you said a minute ago there were three prior instances. Those are what's in appendix 89, described as discourteous comments, unwanted conversation in a negative tone of voice, questioning a supervisor on an email. Those are the three prior instances? Those are the three. But for that to rise to inappropriate conduct and an admonishment I think is significant, and it does mean she has a disciplinary history and that this is a step beyond that. Notwithstanding an admonishment, we now have a homicidal ideation, and that's a significant concern. I can't imagine anyone really wanting to reinstate someone to a position when they've expressed this kind of desire, because what if something happens? And apparently when the VA police notified her supervisor of this statement, the VA police also notified someone else who I thought was an HR person, but maybe I'm wrong. What was that other person's role? The other person's affidavit in appendix 221 just identifies him as a coworker. It does not give a title.  So I don't know. I think the significant concern, of course, is that there is disruption that permeates, I guess ripples out from this event. The affidavit does say administrative officer for education service. You said point to 221, right? Let me take a quick look again. Maybe I skipped over the title when I read this recently. 221. Oh, I see. Administrative officer for education service. I was Serafina Croft's coworker. Thank you, Your Honor. I want to address the issue, just clear the air about this being something that was overheard.  Appendix 105 has her on May 24, 2017, going to the VA police administration building for an interview and admitting the comments to Alberto Diaz, that there's not a counselor in sight when she does that. So there's not a notion that these are truly privileged communications and the like. She was aware that the police were in the room. We're looking for what substantial evidence in the record shows. The police, and we have the police account, Appendix 98, saying that she advised the teleworker she did not feel comfortable speaking to two different sets of people at the same time. And we have a declaration by her indicating the VA officers entered the room while she was on the phone. That's in Appendix 207. So this was not merely overheard. And she was not removed for seeking help. She was not removed for statements made in confidence to a counselor. She was made for the statements made to the police. And it is reasonably foreseeable, and indeed a direct consequence, that if in the presence of the police you express a desire to harm another individual, that individual is going to find out. Some way, somehow. I think that's reasonably foreseeable. The officers' account of what they witnessed in the room was that, at Appendix 98, she stated multiple times in our presence she wanted to kill him. That's different from, I feel I want to kill him. She stated multiple times in our presence that she wanted to kill him. And in that context, when you have a fulsome Douglas factor analysis, even when you take into account mitigating factors of a mental impairment, the seriousness of this misconduct and the fact that there's at the time of the removal no indication it has been remedied is something that the agency, within its discretion, is entitled to conclude warrants of removal here, particularly where the misconduct occurred at work and the VA has a policy against violence in the workplace. Which I assume and hope every agency does. I would hope so. Your Honor, I have plenty of time remaining to answer any questions. Otherwise, I'm happy to rest some briefs. No, thank you. Thank you. Thank you. I'll be very brief. I do want to go back to the interim order just very briefly. It's Appendix 29. This is the administrative judge's initial decision reversing the charge, specifically the interim relief, and it starts that paragraph as part of interim relief. The judge ordered the agency to reinstate the appellant here and then goes on to say the appellant shall receive the paid benefits of this position while any petition for review is pending, even if the agency determines that the appellant's return to or presence in the workplace would be unduly disruptive. When the agency filed their petition for review, they brought her back. So if they believe she was disruptive, why did they bring her back? Outside of that, the agency relies largely based on prior misconduct and admonishment or several admonishments, none of which were threatening remarks. They all had to do with her customer service, her interactions with another co-worker, but nothing akin to this. There was no history of this. The supervisor actually, in his sworn statement, said that there was no history of any threatening remarks made previously, or that he knew of at least. And then again, the agency relies on kind of the voluntary nature of making this statement to the VA police and references specifically to the May 24th VA interview. But the appellant here was not charged with that. The appellant here was charged with the conduct that happened on May 10th and that May 10th conversation. Any voluntary nature of any statements that were made thereafter is not relevant because that's not what she was charged with. And if anything, I think it shows that she was complying with the investigation, with law enforcement, understood her conduct was not appropriate, tried to remedy that conduct, and actually even initially tried to take herself out of that situation altogether. And if there's no further questions, we ask the Court to grant the petition. Thank you.